At this time, Christo, with me is Ellen Varn. I declare this below and appear here on behalf of Appellate and Plaintiff Corporated. Mr. Christo, perhaps for no one else, I just hope that you and your adversary, Francisco, would address at some point during your arguments what the district court did in this case that was really unfair. I hope you get there sooner or later. We will certainly attempt to do that, Madam Chief Justice. Thank you, Mr. Chairman. The Housing Authority claimed there was no claim. It was not authorized that there was an oral complaint. And still later that there was an implied and fact contract for it to proceed. All the while, the district court was certified in this very contract to be valid, and in addition to receiving the goods it did not pay, got the benefits of an ability rate reimbursed from HUD. The counterintuitive nature of the case is that we are therefore faced with a hopelessly inconsistent verdict. We are not able to determine the meaning of a valid contract. We are not able to define the meaning of a condition precedent. This results in a forced distinction between what a contract is and an effective contract for speculation. Was the final judgment of the court, though, based on the verdict? To what extent was it tied, the jury's verdict, to 19? With respect to the contract issue, the court attempted to harmonize it by making or attempting a valid contract and an effective contract. We find out in the brief, and as the original show, there was no distinction made in the charge. And getting back to your honest first question, that's one area where I think the court was unfair. If, as the jury was charged, there's a condition precedent which thereby was not valid, you can have a finding of a valid contract and on the other have the finding of the condition precedent. Moreover, on the evidence of a valid contract, there was a dispute that goods and services were delivered and not paid. So there can be no other finding of breach. It can't be harmonized. That means that we, the inquiry released there and we send it back for a new trial, but there's more. We would submit requires reversal. Almost every involuntary tension was unsupported by this. One of those is that there was no evidence. Not one person on that day either on behalf of the housing authority or entered into this alleged agreement precedent. Wasn't there a lot of evidence in the record that it cost the city anything, that Honeywell was going to get the financing and Honeywell went ahead, even though it was constantly at the time that Honeywell started its work, it was trying to get financing, was it not? Your Honor, I think what you're referring to are the discussions that revolved around the earlier partnering agreement so-called for the audit and the RFP, both of which occurred two and a half years before the final written contract. Now, the DNO talked about no fiscal impact on the housing authority, and as Mr. Gressley stated in the transcript, because he had no independent recollection of this when he testified, but in the transcript, as he stated to Mr. Marchman, who acted as the board for purposes of the DNO, it meant there would be no fiscal impact, no net impact in the end, the end meaning over a 12-year period. No, you added the net. I didn't see that. Well, the quote was no impact in the end, and Mr. Gressley admitted in his testimony that meant no net impact in the end. What Honeywell agreed to and what was negotiated with two lawyers representing the housing authority was a guarantee of energy savings of $700,000 a year. Thus, Honeywell would, to the end, as Mr. Flint also testified and stated in several memoranda that were introduced over my objection, incidentally, which gets us back to that fairness issue, Your Honor, the judge over my repeated objections from day one allowed this to be tried like a fraud case, allowing a plethora of evidence concerning understandings, discussions about this financing condition to be let in in the face of a written contract which is signed, authorized, and says on its face no change may be made to it unless it's duly authorized and signed by parties so authorized to make a change. Now, getting back to Your Honor's issue, the guarantee by Honeywell, which Mr. Flint told them, and they understood, meant that at the end of each year, to the extent energy savings did not reach $700,000, Honeywell would write them a check for the difference, would enable the housing authority to go out and, in effect, bank this guaranteed $700,000 a year payment for 12 years, get the money up front to pay Honeywell. But Honeywell had no ability to force the housing authority to do that, nor was Honeywell in the business of providing the financing, nor did anyone testify that they understood Honeywell was, in fact, going to provide the financing, and that was the agreement, nor did anyone ask for a condition preceding to be put in the contract. Then why was Honeywell trying to negotiate a loan, and why was Honeywell trying to get the financing consistently and constantly? Your Honor, I believe the evidence was that Mr. Klamage, a non-Honeywell employee, was introduced by Honeywell, and Honeywell cooperated in the getting of the financing, but that it didn't actually try to get it itself. Indeed, Gay Yamagiwa, the authorized signatory to the contract from Honeywell's side, testified that was contrary to Honeywell policy, and she had no authority to do that. Mr. Klamage testified that he had third-party lenders ready, willing, and able to execute the financing, and if they didn't, he personally would, because of the guaranteed $700,000 a year savings, which is the revenue stream Honeywell would provide. But know what you will search in vain in the record for anything other than these vague understandings. You will find no one who has testified that, of their knowledge, some person or persons at Honeywell was actually negotiating for the financing or actually going to pay for the financing or that there was any such agreement to do any such thing. All right. I understand your position. Okay. Your Honor. Now, as a result of this, what we have here, and we point this out in our reply brief, a kind of weird situation where there is not a single case cited, and Honeywell has certainly seen none, where one party to the contract ordered the other to perform, received and accepted the performance. That's very important here. And received and retained profits as a result of the performance, and then refused to pay for that performance, alleging that there was never a contract. Even accepting Your Honor's view that, let's assume, arguendo, there was evidence that Honeywell was negotiating for these financing deals and they were going to provide it, even though that's contrary to all the evidence in the case. How do we get around the fact that Mr. Lorenz, fully authorized, and Marshman agreed to this, to do so as a contracting officer for the Housing Authority, issued a notice to proceed? How do we get over the fact that after that, Mr. Lorenz and Mr. Kamaka, both duly authorized, accepted the goods, meaning, as Mr. Kamaka testified, that it was okay to go ahead and pay Honeywell? Assuming for a moment that we throw the evidence out and create evidence that Honeywell was negotiating for financing, the Housing Authority clearly waived it by its subsequent conduct in accepting the goods. It's the legal equivalent of a perpetual motion machine to say that we can lead you along, we can tell you to proceed, we can get your goods, and then we can tell you there's no contract. What I don't understand is why Honeywell continued without being paid after it spent, I guess, roughly $2 million, and then proceeded to spend $4 million when the Housing Authority said, we're not paying you. Well, Your Honor, there was a three-month period. This all happened very quickly. So Honeywell is given the notice to proceed by duly authorized persons after there is a signed contract. And remember now, the Housing Authority goes to HUD. The only precondition everyone does agree on, HUD approves the contract, and the Housing Authority certifies there is a contract. Now, during that three-month period, toilets and furnaces and lights are removed in various locations, including ones right next to the Housing Authority headquarters. And it's not secret work. There are prominent notices in several languages posted on the front of the buildings saying Honeywell is doing this, pursuant to an energy retrofit contract. Now, Honeywell had every reason to believe that it was just a matter of the Housing Authority going forward, banking this deal, which was eminently bankable. Our common sense tells us that if you have a company like Honeywell guaranteeing $700,000 a year for 12 years, somebody will fund you the money, clearly. They had every reason to believe that the Housing Authority was just crossing its T's, dotting its I's to get the money. So they proceeded in good faith. And as Mr. Bromfield testified, it wasn't unusual for a municipal company or a governmental entity to be late in its first payment in getting the paperwork together before payment occurred. It wasn't until after most of the products and services were delivered and installed that Ms. Begman, the lawyer, for the first time wrote to Honeywell and said, wait a minute, there's no contract here. It doesn't exist. So that's why Honeywell did it, Your Honor. Can you help me understand where there is an enforceable obligation under 1983? Yes, Your Honor. That was the subject of one of our two supplemental briefs. 1983 per se, of course, does not, under the latest teachings of the Court, does not give rise to a separate cause of action. We have to look at 1437. And as we point out, reading 1437 together with the regulation under the Southampton rationale provides that impetus. What is it specifically in the regulation that provides an enforceable cause of action in favor of Honeywell? Well, the regulation talks in terms of the requirement that 50 percent of any savings realized have to be paid to the contractor. If that's not for the benefit of the contractor, in this case Honeywell, I don't know what is. We can't. Could you point me to the specific language in the regulation that you regard as critical? Yes, Your Honor. Just a moment. At tab C of our supplemental brief on the subject of 1983, well, actually 1437G, which is how the Court formulated the question, I believe, the first page within tab C, about three, well, 80 percent of the way down the page. Any savings achieved through reductions in any. I'm sorry if you could. Well, I don't have that page. What I have is just the regulation in front of me. Can you give me like the section number and subsections and so on? Yes, I can give you that site. I mean, it's. Fifty six F.R. four, six, three, five, seven. The requirement is embodied in 24 CFR 990.107, paren F as in Frank, paren one, which is previously G1 in the 1991 version. So F1. Okay. All right. Okay. I'm with you. Okay. It allows that. That's the passage. Yes. If the contract allows the PHA's payment to be dependent on the case savings, the PHA must use to pay the contractor. With this type of contract. Okay. I'm with you. Okay. So you say the must pay the contractor gives you an enforceable legal right. Not just the regulation alone, because I agree, since the more recent case law, we couldn't rely on the regulation absent the statute. We have to read under South Camden the reg and the statute together. But doesn't the statute deal with funding public housing authorities and have really nothing to do with private contractors? Well, the statute does deal with funding public housing authorities, Your Honor, but it states that there will be a freeze of that funding to allow energy retrofits. And as we point out, implicitly in that scheme is the concept that since the housing authority, HUD is not going to provide the financing, therefore, or the revenue stream, therefore, that the housing authority has to contract with an outsider for these energy retrofits. That's the whole reason for that freeze. Don't you have to show both that the regulations create enforceable rights and that this particular regulation is intended to benefit private contractors? Of course. And that is why we point to the statute read in conjunction with the reg, which was promulgated and to which Congress has never indicated any disagreement, and in consonance with the legislative notes to the statute, which clearly show that Congress was looking at encouraging the use of outside contractors for energy retrofit programs such as this, thus encouraging contractors through the device of the freeze to do this because it would be a vehicle for payment of that freeze. Now, it may be considered by Your Honors that it's a distinction without a difference because at least for this part of the case, we get to the same place. That is, Honeywell gets 50 percent of the savings under his Honor's ruling below on the equitable relief claim as well as the 1983 claim. Here's why I care about it, Your Honor. 1983 gives us the right to attorney's fees. Should this verdict stand, and I urge this Court obviously that it not, but should it stand, we're still faced with an attorney's fees claim. Because Honeywell's contract provided that Honeywell is entitled to attorney's fees if it has to collect money under California law, it's bilateral, it's mutual. Thus, the housing authority now claims, in addition to having gotten the whole freeze on certifying there was a contract, in addition to getting all the goods and services, not paying a dime for it, they now claim that the prevailing party and they're entitled to attorney's fees. My only rebuttal to that is my 1983 claim. Without it, I'm in a situation where I'm going to pay more than my equitable relief in attorney's fees for something they got never paid for. You've just about used all your time. If you want to save a couple of minutes. I would like to, Your Honor. Thank you very much. Thank you. May it please the Court. My name is Gary Lafayette with the law firm of Lafayette & Kumagai here in San Francisco, and we represent the respondent and the cross-appellant in these proceedings. And I'd like to start out by advising the Court that from the beginning, the housing authority's position has been that this is a contract which, if ever entered into, would embody and embrace each and every submission submitted in response to the RFP, which started this entire process. That would mean the partnering agreement. That would mean the response to the RFP. That would mean each and every representation made by Honeywell with regard to financing. And those representations made by Honeywell were legendary. They started with the response to the RFP, where Honeywell advised that it would provide the funding. And most specifically, they relate to the partnering agreement, which is specific in detail. This agreement, which is signed as an agreement, entered into between the parties, stated that program goals remove financial and technical risk from the authority, partner financial parameters, no upfront capital, complete financing over 10 to 15 years. After completion of the engineering analysis, Honeywell stated in this agreement that it should develop for contract the following, a municipal lease or other mutually agreed upon funding source. The last provisions in this partnering agreement that was entered into less than nine months before the final agreement was entered into stated that should the contract meet the financial criteria, meet the financial criteria, then the housing authority will enter into an arrangement with Honeywell. It was clear from all documentation, from all agreements entered into, that financing was an integral part of what was to happen here. And why? Because this agency standing alone could not afford to pay these monies out unless there was a financing agreement. Highlighting that, two months before this agreement was struck, this housing authority was taken over by HUD because of financial problems. No one was under any illusion here that this housing authority had the millions of dollars available to it to pay the monies that Honeywell is now talking about. That was clear. Highlighting the clarity of that point becomes the documents leading up to the execution of the contract. There is a transcript that was prepared of the first meeting where Undersecretary Marchman, sitting as the board for the housing authority, was advised as to the terms and the conditions of what this deal would be. And why is that important? Because he is the only person who is authorized to go forward with a deal. And so what we're looking at is his understanding as to what this deal is supposed to be, who's present. There are individuals from Honeywell who are sitting there while this presentation is being made, what is said. The authority will not pay out any money to Honeywell to do these installations. What else is said? Those savings will generate the funds that will then be used to repay Honeywell for their advance of those funds. So essentially, they, meaning Honeywell, are doing a financing arrangement. They will act as the contractor and install energy-efficient lighting. And then there is an acknowledgment that the Honeywell representatives were present at the time that this took place. Then what happens after that? The DNO, which is the one document that needed to be executed by the commission, in that case Undersecretary Marchman operating as the commission, states the following. In the preamble, which talks of the whereases, it says, Honeywell will provide this effort with no fiscal impact to the authority. It goes on to say this program is self-funding, does not require any initial capital expenditures from the SFHA, and all costs must be amortized by the savings produced. And then in the order of directive of this proceeding, it states, the chief operating officer is authorized to award a contract for said work to Honeywell with no fiscal impact to the San Francisco Housing Authority. That was the extent of the authority that was given. And that authority was given with a clear understanding. One, the agency couldn't afford this deal any other way. And number two, financing, a municipal lease, something was necessary in order for this deal to go forward. And Honeywell can ill afford to say that it was unaware of that. There was a second meeting which took place thereafter, where a Honeywell person came forward, made a presentation, and at no point stated that the information given to you, Undersecretary, just at the last meeting was erroneous or wrong. That never took place. The Undersecretary proceeded forward with the understandings and with the representations. Highlighting all of that, we then go to Honeywell's responses to the interrogatories in this case, where Honeywell point blank states that there was an agreement between the parties to provide financing. I find it inconceivable that Honeywell can say, having made such an admission in its interrogatory responses, that there was no agreement. What weight would interrogatories have if we could stand up and sign those, send those out in response to discovery, and then turn around and say they have no weight? In the end, and the question I think that was presented, is what is it that the district court did that was unfair? The answer to that question is nothing. Well, let's talk about that for just a moment. Honeywell spent a lot of money, and you've accepted the benefits of all of that. The Housing Authority got the benefit of the freeze and all of the benefits there. Why shouldn't then that benefit be passed on to pay for the actual work performed by Honeywell? The complete record, when you look at the complete record, it is not as though my client has received anything that has been of value. If you look at the documentation here, Honeywell says that important for these benefits to be achieved is service, and for an additional fee, Honeywell would perform that service. Well, that service has never been performed. My client has co-generating facilities, which are in the record, that are reflected, that have never, ever been brought online. Hulks of metal sitting, resting. That's what my client bought, and that's what Honeywell wants to have my client pay for. Lighting fixtures, which cannot be replaced, that are sitting idle, or which have been torn out and replaced with other lighting fixtures. That's what my client paid for. But let's go back again, and let's look at the last document that I would direct your attention to, which is a letter that was prepared after two things had taken place. One, this agreement was executed by Honeywell and the then acting executive director, and two, Honeywell had received what it called the notice to proceed. What is it that Honeywell was doing internally? And I direct your attention to a letter that was prepared June 16, 1996, and it was from an individual whose name is Stephanie Macy at Honeywell, and it was sent to David Klamich, the person who Honeywell says was a third-party outside person, who actually the testimony indicated had received hundreds of millions of dollars of contracts from Honeywell, who called himself Honeywell's partner, who was so impeached in the proceedings that his credibility completely went down the drain. But what does she say in this email? Because she is the person who has to give the go-ahead, go forward or not go forward. She states, is the funding in place or still in progress? Then what does she write? We might as well start this off on the right foot. I appreciate your help. What is she saying and what does she tell us? She was aware that even though this agreement had been signed and a notice to proceed had gone out, that Honeywell and the housing authority had not arranged for third-party financing. She knew that, and she was going to her supervisors to try and get some feedback on whether or not they should go forward. And what is it that her supervisors do, knowing full well that financing was required? They say, go ahead and do the work. Now, what's the significance of all of that? The agreement that they want us to embrace says that someone is to deposit over a million dollars before the work is done. Someone is to deposit another million dollars 30 days after that. Someone is to deposit another million dollars 30 days after that. No one is depositing these million dollars. Honeywell knows no one is depositing these million dollars. Honeywell's own internal documents say that they know it and that they should be leery of going forward, yet they do it anyway. If you uphold a contract like that, then you're essentially saying that companies like Honeywell can force contracts upon governmental entities, and the people wind up footing the bill for that. That would be the unfairness of everything. If that became the rule, Honeywell can't create the environment that it created, and then having created that environment, take advantage of it. And that's what this case was all about. Honeywell knew. It at all times knew. And it acted on its own. There's a question about the 1980s. I think this is an elaboration of Judge Nelson's question. Assuming that there is no recovery in this case based upon a contractual obligation, but rather on a quasi-contractual or quantum merit basis, why is it sufficient in terms of fairness to have provided only the recovery that the district court ordered? That is to say, there's not much money coming out of you guys going toward Honeywell. That's correct, Your Honor. The way the district court ruled, and we do take exception with that as well. But I'm asking that from the other direction. That is to say, I'm asking it from Honeywell's side. Why is that? Why did he order enough out of you? Because if we award Honeywell anything, then we're rewarding Honeywell for conduct for which they should not be rewarded, for going forward with a contract that they didn't work with. No, I'm asking you a different question. That is to say, you started the answer by talking about hoax and light fixtures torn out. The question is, how much advantage did you receive from the work that Honeywell unquestionably did perform? And as I read what happened here, the district judge awards to Honeywell only 50% of the savings coming out of HUD, rather than, okay, this is what this is going to be worth to you down the road. Why is that fair to Honeywell? Why is that fair to Honeywell? You're making me move myself around, but I'll attempt to try and answer the question. I think this is Judge Nelson's question as well. That's correct. I think, I hear the question right. Why is that fair as opposed to awarding something else to Honeywell? Something more. Yes. And I think it's fair because if you do look at the regulations, and all parties were aware of the regulations, it was clear that a couple of things could only happen. One, Honeywell, the housing authority under the regulations were only required to pay 50% towards the contractor. That's number one. But number two, these deals were to be structured in such a way that housing authorities would be relieved of the benefit, of the burden of some of its energy consumption demand. And if you look at it any other way, then this housing authority would not be keeping those energies. Honeywell's position would be, pay me the $5 million. If that was something that was to happen, then the housing authority would have really got to walk in on this deal. Because if there was a benefit of $5 million, $7 million, what's the benefit? Because the savings that you did receive, and even if you were still getting all of those savings, you should be able to go to Honeywell to work, never amounted to enough to pay for that. You would never pay. No, I'm afraid we're still not quite on the same page. I'm not asking whether or not you should be required to pay the full contract price. I am asking, rather, is the monetary award against you fully the equivalent of the benefit that you have received from the work that Honeywell did? That would be the benefit of the work that we have received from Honeywell. We want to look at it that way. The only other thing to look at would be that there is roughly $900,000 worth of savings that we realize. If you could look at that and say that the whole $900,000 would be the benefit of what we receive, that would be making two assumptions. One is that all of those savings were attributable to Honeywell's work, and the reality is and the testimony in this case is that that is not the case because the housing authority undertook efforts on its own to address some of these energy concerns. But isn't it also true that the understanding under which Honeywell went ahead with this was that it was essentially working under an understanding it was going to get half the savings? No, it wasn't working under that. It never worked under that. I don't think there is any testimony to that fact. I think there is a federal recommendation that says something to that effect. But I think the other side of that is we are structuring a deal where we are going to pay for these improvements with the revenue generated by the savings. And then there are additional provisions down here, for example, where Honeywell guarantees that there are going to be a certain savings. So if in reality we don't achieve the savings in Honeywell, at some point in time we have to make a judgment that they are going to get back to the housing authority. Well, what was the standard that the district court used? What was the standard that the district court used? What was the measure that it used? The measurement standard? Yeah. What it did was look straight to the regulatory provision, which says that there is a 50 percent contribution from the savings to the contractor. If I could address the 1983? Yes, please. Okay. The 1983 claim, I will speak quickly, realizing what the clock is stating here. There are a couple of visions I think that we need to take notice of, starting with Sandoval and then going to the Camden case. The Camden case states that the Supreme Court has established a three-part test to determine whether a federal statute creates an individual right enforceable under a Section 1983 claim. And what they're essentially saying is that claim has to be based upon the statute. Clearly, it cannot be based upon the regulation only, because if that were the case, we would be tampering with the separation of powers between the executive and the legislature, and we would be giving the executive branch, which controls these agencies, the opportunity to create rights by enacting and promulgating regulations. That's clearly not contemplated here. That's why we have to first look to the statute, and there is absolutely nothing in the statute itself which creates a right that protects contractors. In fact, contractors aren't even mentioned in the statute. And having said that, I direct the Court to pages 786 and, excuse me, I direct the Court to the Camden case where there is a citation to the Supreme Court statute. And they also want to state that statutes that focus on the person regulating rather than the individual protected created no implication of an intent to confer rights on a particular class of persons. Section 602, in that case, against that further rule, it focuses neither on the individual protected nor even on the funding recipient being regulated. Here, the statute only speaks to that entity being regulated, housing authorities. It doesn't speak to the entity which the appellate would have be the protected person, the contractor. To the extent that it doesn't even speak to the contractor, it can't create a protected right. If we hold that the district court made a mistake in finding a cause of action under 1983, what happens to attorney's fees? I understand that the 1983 attorney fees go away. What otherwise happens to attorney's fees? If the contract claims stand, then the housing authority is entitled to recover reasonable costs of attorney's fees under the agreement interdicted between Pennywell and the housing authority. But if the only recovery against you is under a quantum Meroweth theory, then what? If it is a quantum Meroweth theory, meaning it is outside the contract, I think that the housing authority still recovers its fees, but the appellate does not. Okay. But that yet has not been addressed by the district court? That has not been addressed by the district court. It's just for the record that we're getting attorney's fees claims filed, and the district court hasn't ruled on either one of those as yet. Okay. Your time has just about expired. You're not going to get another chance. So would you ‑‑ your cross appeal, you're asking for what? In our cross appeal, we're asking to reverse what the district court did in setting the estoppel remedies and the 1983. And your position is that Honeywell is entitled to nothing? That's correct, because Honeywell can't prove that it proceeded in reliance upon anything that my client did, specifically because internally the evidence shows that it did what it did, despite what my client said. Was it working on buildings that your client controlled? It did work on buildings that my client controlled, Your Honor. That's clear. Okay. Thank you. Thank you, Your Honor. Thank you, Your Honors. I believe I have a few minutes for rebuttal. First, with respect to the fairness issue that Your Honors raised, the record reveals that HUD was certified to, by the housing authority, year after year after year that this contract was valid and existing, and that up until the time of trial, for three years, there's nine years left to go. So far we know they're still doing this every year, certifying this contract exists, that is being argued before Your Honors doesn't exist. They had gotten $1.3 million in savings and pocketed it. And then there was a revision to this, not yet submitted to HUD, which claims it was only $900,000, which we never really got to explore. Judge Henderson ordered 50 percent of that. They pocket 50 percent for doing nothing but lying to HUD. Either that or lying to this Court. I mean, they're mutually inconsistent positions. And 50 percent of the future savings, which continue to this very day. Fairness would indicate clearly all of those savings, at a minimum, should go to Honeywell. The argument was made, I talked earlier about the counterintuitive nature of this dispute. If Honeywell was supposed to get the financing, why didn't it do so to pay themselves? Why didn't the contract specify that? The contract specified nothing of the kind. Clearly, Honeywell knew they were going to get financing to pay them, but it was the housing authority's obligation to do that. To do what? To get the financing. Not Honeywell's. Honeywell would assist by providing the guarantee of $700,000 a year, which in turn the housing authority could bank. But Honeywell couldn't force the housing authority to go get the financing if they didn't want to. The issue here before this Court was whether the understanding they would get financing becomes a condition precedent or, as counsel has argued so effectively, a representation. But we know it can't be a representation because of well-settled law that when you sign a document that clearly says the reverse of what you claim was an inducing representation, you can't rely on it. Thank you, Your Honor, very much. I appreciate the time. Okay. Before hearing the last case, the Court will take a ten-minute recess. Thank you.
judges: Schroeder, Dw Nelson, W. Fletcher